GILL HOLDING COMPANY, INC.,

        Plaintiff,

        Case No. 18-cv-316

   vs.

        Hon. Paul L. Maloney

SUMMIT PARTNERS CREDIT ADVISORS,
L.P.,

        Defendant.

_____/

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF DEFENDANT SUMMIT PARTNERS CREDIT ADVISORS, L.P.

### ANSWER

Defendant Summit Partners Credit Advisors, L.P. ("Defendant" or "Summit"), through its undersigned counsel, answers the Complaint ("Complaint") of Plaintiff Gill Holding Company, Inc. ("Plaintiff" or "Gill") as follows. No response is required to the various headings throughout the Complaint. To the extent that responses are required to such headings, they are denied. To the extent that any allegation in the Complaint is not specifically admitted, it is denied.

1.    This is a declaratory judgment action.| Defendant, Summit Partners Credit Advisor, L.P. ("Summit") has improperly contended that it has an exclusive right of unlimited duration to provide financing to Gill and has improperly demanded that Gill cease any attempts to pursue alternative financing.| Summit is wrong.| The exclusivity obligation was limited to 90 days and later extended at Summit's request to 150 days.| After that, the exclusivity obligation expired. As a result, Gill is free to pursue alternative financing.| Based upon the unreasonable and unsupported position taken by Summit, Gill is also justifiably concerned that Summit will

assert an unsupported and inflated claim for expenses allegedly associated with the failure of the parties to close a financing transaction. |Simply stated. Summit is trying to strong-arm Gill into paying millions of dollars in fees that Gill does not owe.

**ANSWER:**

**Defendant admits that Plaintiff has moved for a declaratory judgment, but denies that Plaintiff is entitled to a declaratory judgment. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 1.**

2.     Gill is a Michigan corporation that, among other things, supplies automotive parts to the automotive industry. Gill's headquarters is in Grand Rapids, Michigan.

**ANSWER:**

**Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 2.**

3.     Summit is a New York limited partnership. Summit does business in Michigan.

**ANSWER:**

**Defendant admits that it has conducted business with Gill in Michigan. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 3.**

4.     This Court has subject matter jurisdiction because the amount in controversy, exclusive of interest and costs, exceeds $25,000.

**ANSWER:**

**To the extent the allegations in Paragraph 4 state a legal conclusion, no response is required. Defendant admits the amount in controversy exceeds $25,000. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 4.**

5.     Venue is proper because a substantial part of the events or omissions giving rise to this action occurred in this county, because Defendant has conducted and continues to conduct business in this county, and Gill is headquartered in this county.

**ANSWER:**

**To the extent the allegations in Paragraph 5 state a legal conclusion, no response is required.   To the extent a response is required, Defendant admits that it has conducted business with Gill in Michigan.   Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 5.   Except as expressly admitted herein, Defendant denies the allegations in Paragraph 5.**

6.     Beginning in 2016 and continuing into 2017, Gill contemplated selling its business. To facilitate that potential sale, Gill engaged Deloitte Corporate Finance, LLC("Deloitte") to find a buyer.

**ANSWER:**

**Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 6.**

7.     Deloitte identified potential buyers for Gill, including Jimmie Comer ("Comer").

**ANSWER:**

**Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 7.**

8.     Comer engaged Davis Capital Advisors, LLC ("Davis") as his broker for the potential transaction with Gill.

**ANSWER:**

> **Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 8.**

9.     Gill and Comer, through his entity Augusta Acquisition Company, LLC ("Augusta"), entered into a letter of intent in August 2017 ("LOI") for a potential sale of Gill to Augusta. However, Comer needed to obtain both debt and equity financing to complete the contemplated transaction.

**ANSWER:**

> **Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9.**

10.     As Comer's broker, Davis helped Comer seek both debt and equity financing for the potential transaction, including possible debt financing from Defendant Summit Partners Credit Advisors, L.P. ("Summit").

**ANSWER:**

> **Defendant admits that Davis Capital Advisors, LLC ("Davis") and Defendant communicated regarding a possible debt financing for a purchase transaction involving Gill.   Except as expressly admitted herein, Defendant denies the allegations in Paragraph 10.**

11.     On May 26, 2017, Summit and Davis entered into a Confidentiality Agreement (the "Confidentiality Agreement").

**ANSWER:**

> **Defendant admits that, on May 26, 2017, Summit and Davis entered into a Confidentiality Agreement (the "Confidentiality Agreement").**

12.     The Confidentiality Agreement is a routine agreement to protect confidential information provided by Augusta, or by Davis on behalf of Augusta, to Summit.

**ANSWER:**

**Defendant states that the Confidentiality Agreement referenced in Paragraph 12 speaks for itself and denies any allegations inconsistent with its contents.**

13.     Gill was not a party to the Confidentiality Agreement.

**ANSWER:**

**Defendant admits the allegations in Paragraph 13.**

14.     The Confidentiality Agreement did not require Gill to pay any fee to Davis or Summit. And it did not in any way prohibit Gill from obtaining financing from Summit or others in a later transaction.

**ANSWER:**

**Defendant states that the Confidentiality Agreement referenced in Paragraph 14 speaks for itself and denies any allegations inconsistent with its contents.**

15.     The transaction contemplated by the LOI was not timely consummated because Comer/Augusta was not able to obtain debt and equity financing consistent with the terms of the LOI within the time provided under the LOI.

**ANSWER:**

**Defendant admits that the transaction referenced in Paragraph 15 was not consummated.  Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 15.  Except as expressly admitted herein, Defendant denies the allegations in Paragraph 15.**

16.     When the potential sale did not close as contemplated by the LOI, JP Morgan Chase Bank N.A. ("Chase"), one of Gill's lenders, decided that it no longer wanted to finance Gill. Accordingly, Gill needed to refinance its loan with Chase on an expedited basis.

**ANSWER:**

**Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 16.**

17.     Gill again engaged Deloitte, this time to find a new lender to replace Chase.

**ANSWER:**

**Defendant lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 17.**

18.     Deloitte identified a number of parties, including Summit, as potential lenders who could refinance the loan.

**ANSWER:**

**Defendant admits that Deloitte Corporate Finance, LLC approached Defendant regarding a potential financing. Except as expressly admitted herein, Defendant states that it lacks information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 18.**

19.     Summit is a Boston-based private equity investment firm that invests in a broad range of companies in North America and Europe. Upon information and belief, Summit has raised more than $20 billion in capital through multiple equity and fixed income funds.

**ANSWER:**

**Defendant denies the allegations in Paragraph 19.**

20.     In other words, Summit is a major, global equity investment firm that regularly provides financing to companies.

**ANSWER:**

**Defendant denies the allegations in Paragraph 20.**

21.     Gill began to work with Summit as a potential lender to refinance Gill.

**ANSWER:**

**Defendant admits the allegations in Paragraph 21.**

22.     Accordingly, Gill and Summit entered into a term sheet dated September 21, 2017 (the "Term Sheet") to outline certain terms to be included within a definitive agreement for proposed financing. A copy of the Term Sheet, which purports to be confidential, is in the possession of Summit.

**ANSWER:**

**Defendant admits that it entered into a Term Sheet agreement dated September 21, 2017 (the "Term Sheet"). Defendant states that the Term Sheet speaks for itself and denies any allegations inconsistent with its contents.**

23.     The Term Sheet contained a 90-day exclusivity provision. The Term Sheet obligated Gill to pay Summit an "alternative transaction fee" if, within 90 days after execution of the Term Sheet, Gill entered into a financing arrangement with a party other than Summit.

**ANSWER:**

**Defendant states that the Term Sheet referenced in Paragraph 23 speaks for itself and denies any allegations inconsistent with its contents.**

24.     On January 12, 2018, recognizing that the exclusivity period had expired. Summit requested Gill to agree "to extend the exclusivity per our 9/21/17 term sheet" from 90 to 150 days.

**ANSWER:**

> **Defendant admits that, on January 12, 2018, Kevin Messerle of Defendant sent an email to Fred Hubacker of Gill. Defendant states that the January 12, 2018 email speaks for itself and denies any allegations inconsistent with its contents.**

25.     On January 17, 2018, Gill agreed to "modify the 9/21/17 term sheet with Summit regarding exclusivity from 90 days to 150 days."

**ANSWER:**

> **Defendant admits that, on January 17, 2018, Mr. Hubacker sent an email to Mr. Messerle. Defendant states that the January 17, 2018 email speaks for itself and denies any allegations inconsistent with its contents.**

26.     Despite this extension, the parties were unable to reach an agreement on the terms of the financing, including appropriate financial covenant levels.

**ANSWER:**

> **Defendant admits that Defendant and Gill have not consummated a financing transaction. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 26.**

27.     Summit failed to provide financing to Gill within the exclusivity period of 150 days.

**ANSWER:**

> **Defendant denies the allegations in Paragraph 27.**

28.     As a result, Gill sought alternative financing as it was permitted to do under the Term Sheet.

**ANSWER:**

**Defendant denies the allegations in Paragraph 28.**

29.     Summit has wrongfully demanded that Gill cease any attempts to pursue alternative financing.

**ANSWER:**

**Defendant admits that counsel for Defendant sent a letter to counsel for Gill on March 8, 2018. Defendant states that the March 8, 2018 letter speaks for itself and denies any allegations inconsistent with its contents.**

30.     Summit has also threatened legal action against Gill, including seeking injunctive relief (to which it is not entitled) to prevent Gill from consummating an alternative financing transaction.

**ANSWER:**

**Defendant admits that counsel for Defendant sent a letter to counsel for Gill on March 8, 2018. Defendant states that the March 8, 2018 letter speaks for itself and denies any allegations inconsistent with its contents.**

31.     If Gill is prevented from closing alternative financing, as threatened by Summit, Gill will be irreparably harmed.

**ANSWER:**

**Defendant denies the allegations in Paragraph 31.**

32. Because Summit is making improper and unsupported demands. Gill brings this declaratory action to resolve the parties' rights and responsibilities.

**ANSWER:**

**Defendant admits that Plaintiff has moved for a declaratory judgment, but denies that Plaintiff is entitled to a declaratory judgment. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 32.**

33. Gill incorporates by reference the preceding paragraphs.

**ANSWER:**

**Defendant repeats and incorporates by reference its responses to the preceding Paragraphs 1-32 as if fully set forth herein.**

34. Summit has improperly demanded that Gill cease any attempts to pursue alternative financing and has threatened legal action against Gill.

**ANSWER:**

**Defendant admits that counsel for Defendant sent a letter to counsel for Gill on March 8, 2018. Defendant states that the March 8, 2018 letter speaks for itself and denies any allegations inconsistent with its contents.**

35. But, as Summit knows (and has acknowledged in writing), the exclusivity period in the Term Sheet expired after 90 days, and was then extended to 150 days.

**ANSWER:**

**Defendant denies the allegations in Paragraph 35.**

36. Summit has no basis to contend that the exclusivity period has not expired and no basis to demand that Gill not pursue alternative financing.

**ANSWER:**

**Defendant denies the allegations in Paragraph 36.**

37.     Summit has no basis to demand payment of an alternative transaction fee.

**ANSWER:**

**Defendant denies the allegations in Paragraph 37.**

38.     Summit also has no basis to inflate a claim for expenses associated with its attempt to finance a transaction with Gill.

**ANSWER:**

**Defendant denies the allegations in Paragraph 38.**

39.     The facts and circumstances of this case present an actual controversy regarding the contractual and legal rights and obligations of the parties.

**ANSWER:**

**To the extent the allegations in Paragraph 39 state a legal conclusion, no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 39.**

40.     The rights of the parties can only be determined by a declaratory judgment.

**ANSWER:**

**To the extent the allegations in Paragraph 40 state a legal conclusion, no response is required.  To the extent a response is required, Defendant denies the allegations in Paragraph 40.**

41.     Gill is entitled to a declaratory judgment stating: (a) the exclusivity period expired 150 days after September 21, 2017; (b) Gill is not prohibited from pursuing and closing alternative financing; (c) Gill does not owe any alternative transaction fee to Summit; and (d)

Summit is not entitled to any expenses associated with the failed transaction other than amounts provided in the Term Sheet.

**ANSWER:**

**Defendant denies the allegations in Paragraph 41.**

42. Therefore, Gill requests that this Court declare: (a) the exclusivity period expired 150 days after September 21, 2017; (b) Gill is not prohibited from pursuing and closing alternative financing; (c) Gill does not owe any alternative transaction fee to Summit; and (d) Summit is not entitled to any expenses associated with the failed transaction other than amounts provided in the Term Sheet.

**ANSWER:**

**Defendant admits that Plaintiff has moved for a declaratory judgment, but denies that Plaintiff is entitled to a declaratory judgment. Except as expressly admitted herein, Defendant denies the allegations in Paragraph 42.**

## PRAYER FOR RELIEF

**WHEREFORE**, Defendant respectfully prays for relief and judgment:

A. Denying Plaintiff the relief sought in the Complaint;

B. Dismissing the Complaint with prejudice;

C. Awarding Defendants costs and expenses incurred in connection with the defense of this action, including attorneys' fees; and

D. Granting such other and further relief as the Court may deem just and proper.

## AFFIRMATIVE DEFENSES

Defendant alleges, asserts, and avers the following affirmative and other defenses, which apply to each cause of action asserted in the Complaint to which such defense is or may be

applicable. By virtue of alleging these defenses, Defendant does not assume any burden of proof, persuasion, or production not otherwise legally assigned to Defendant. Defendant also does not concede that facts contrary to one or more of the averments that follow would support liability as to Defendant. Defendant reserves all rights to assert other defenses as appropriate.

## FIRST AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, for failure to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, because Plaintiff would be unjustly enriched if allowed to recover any relief claimed to be due.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, by the doctrines of waiver, estoppel, unclean hands, and/or laches.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, because Defendant's alleged conduct was licensed, released, authorized, ratified, confirmed, and/or approved by Plaintiff.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claim is barred, in whole or in part, by Plaintiff's breach of contract.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to take steps to mitigate the damage alleged in the Complaint and has failed to mitigate any such alleged damage.

## ADDITIONAL AFFIRMATIVE DEFENSES

Defendant hereby gives notice that it intends to rely upon such other and further defenses as may become available and apparent during discovery proceedings in this case and hereby reserves the right to amend this Answer and assert such defenses.

## COUNTERCLAIMS

1.  In the fall of 2017, Counterclaim-Defendant Gill Holding Company, Inc. ("Gill"), an automotive-supply company, needed to refinance significant outstanding loans and approached Counterclaim-Plaintiff Summit Partners Credit Advisors, L.P. ("Summit"), through an intermediary, to provide those much needed funds. Summit agreed to lead the proposed financing transaction, provided that Gill agreed to deal exclusively with Summit in connection with its refinancing needs. Gill unambiguously promised to do so, and it signed a binding term sheet on September 21, 2017 (the "Term Sheet") memorializing that commitment.

2.  With the executed Term Sheet in hand, Summit got to work on the financing transaction. Throughout the rest of 2017 and into early 2018, Summit worked diligently to build a lending syndicate that would provide the funds that Gill needed—efforts that included calling capital from Summit's limited partners involved on the deal—and drafted the various documents that would govern the financing transaction. As a result of those substantial efforts, the parties were on track to close the financing transaction on or around February 18, 2018, and Summit had every expectation that the parties would do so.

3.  But, as the closing approached, the momentum for the financing transaction slowed, and for reasons completely out of Summit's hands. Unbeknownst to Summit, Gill, on information and belief, had been working with another funding source—The Huntington National Bank ("Huntington"), primarily through its Cleveland and Detroit offices. Gill had

initiated this process by demanding that Summit bring Huntington into the lending syndicate at a late stage in the financing transaction and several months after Gill signed the Term Sheet.

4. On information and belief, all of this activity was purposeful: Gill intended to delay and frustrate the financing with Summit in an attempt to circumvent an express liquidated damages provision in the Term Sheet. On information and belief, Huntington then proceeded to contact the very lending partners that Summit, at great time and expense, had procured for its financing transaction with Gill. This dealing with Huntington indisputably breached Gill's promise of exclusivity to Summit.

5. Gill has knowingly and in bad faith breached the clear provisions of the Term Sheet, causing Summit significant harm and costing Summit the economic opportunity of the financing transaction. Summit therefore brings these counterclaims to vindicate its contractual and other legal rights and to recoup the millions of dollars in damages it has suffered at the hands of Gill, including the value of the lost opportunities of pursuing other transactions.

## PARTIES

6. Summit is a limited partnership formed under the laws of Delaware. For purposes of diversity jurisdiction, Summit is a citizen of the states of California, Connecticut, Florida, Hawaii, Illinois, Massachusetts, New York, Pennsylvania, and Texas and of the foreign states of Germany, Hong Kong, and the United Kingdom.

7. Gill is a corporation formed under the laws of Michigan with its principal place of business in Michigan.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1332. The parties are diverse and the amount in controversy exceeds $75,000.

9.     The Court has personal jurisdiction over Gill because Gill is domiciled in Michigan.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the counterclaim occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Gill And Summit Enter Into The Term Sheet.

11.     In September 2017, after Gill concluded that it would not seek a sale with Davis Capital Advisors, LLC, Gill and Summit entered into an agreement whereby Summit would seek to refinance some of Gill's debt and organize a lending syndicate for that purpose.

12.     To that end, on September 21, 2017, the parties came to an agreement on the principal terms of such a transaction, and those principal terms were memorialized in the Term Sheet.

13.     The Term Sheet contains a number of binding provisions related to the financing transaction.

14.     One of the provisions in the Term Sheet binding on the parties involves an agreement by Gill to "work exclusively" with Summit in acquiring financing. Any action by Gill to seek financing from another source, whether or not such financing is consummated, falls within—and is a breach of—this provision. There is no limit on the duration of this exclusivity obligation; it is enforceable for so long as Summit is willing to continue with the transaction.

15.     In addition to and separate from the binding exclusivity obligation, the Term Sheet provides for a binding "Alternative Transaction Fee." This fee operates as a liquidated damages clause for *certain* breaches of the exclusivity obligation. Specifically, the clause

provides a fixed amount of damages (which is in the millions of dollars) if Gill "enters into a

financing" with another party within a specified period of time. As originally written, the period

in which the Alternative Transaction Fee applied was 90 days from the signing of the Term

Sheet, but this date was later extended to at least February 18, 2018.

16.     In full, these clauses read as follows:

> Upon execution of this term sheet, ***the Borrower agrees to work
> exclusively with Summit for purposes of providing financing*** to
> consummate the transactions contemplated herein. ***If, within 90
> days after the execution of this term sheet, the Borrower enters
> into a financing with a party other than Summit,*** other than the
> Revolving Facility (a "Competing Facility"), ***the Borrower shall
> pay to Summit a fee equal to 2.5% of the principal amount of the
> Facility*** within one week of the close of such Competing Facility;
> provided, however, that no Alternative Transaction Fee shall be
> due and owing from Borrower (i) if the parties are unable to reach
> agreement on appropriate financial covenant levels based on the
> principals set forth herein, or (ii) to the extent that Summit
> expressly indicates in writing (including by email) that it is
> unwilling or unable to provide the contemplated financing on the
> terms set forth herein (or such other terms which the parties may
> agree to after the date hereof) (a "Termination Notice"), provided,
> that, Summit agrees to act in good faith in making such
> determination on a timely basis and to deliver such Termination
> Notice promptly upon its determination to abandon the transactions
> contemplated herein.

(Emphasis added.)

17.     Another provision in the Term Sheet binding on the parties discusses certain

"Expenses" incurred by Summit in any way relating to the financing transaction and provides for

payment by Gill of all of these expenses. These Expenses are due on demand, including if a

transaction between Summit and Gill does not close. These Expenses include all costs expended

by Summit in due diligence and in putting together a potential lending syndicate, as well as

Summit's costs and attorneys' fees, including those costs and fees incurred in connection with

this litigation since, among other things, it relates to the financing transaction contemplated under the Term Sheet.

18. In full, this provision reads as follows:

> **The Borrower agrees to pay to Summit**, upon demand, an amount equal to **all of Summit's, the Lenders' and the Agent's costs and expenses relating to the Facility, the transactions contemplated herein, and the negotiation of any potential transaction with the Borrower ("_Expenses_")**. Expenses may include, without limitation, **documented legal fees and expenses, financial examination expenses, and the documented costs and expenses of accounting firms with respect to a quality of earnings or other reports**. For the avoidance of doubt, in the event that, for any reason, the Facility does not close or a transaction with Summit is not consummated, the Borrower shall promptly pay to Summit, upon demand, an amount equal to all Expenses incurred.

(Emphasis added.)

## II. Gill Pushes Summit To Work With Huntington.

19. After entering into the Term Sheet with Gill, Summit began an intensive and extensive due diligence process into a prospective refinancing of Gill's debt. The due diligence process lasted nearly two months, and Summit did not complete it until late November 2017. Summit devoted at least seven partners and employees directly to this deal—not counting the weekly meetings with the entire investment committee—who, along with a team of transactional attorneys, reviewed thousands of pages of documentation. For several of the members of the Summit team, the Gill deal represented a majority of their time for several months. Summit consulted with experts who prepared to opine on various issues, including accounting, legal, and personnel diligence matters. The resources expended for the due diligence process alone were at least $200,000.

20. While conducting its due diligence on Gill, Summit was also actively working to secure a syndicate of lenders for Gill. As a part of that effort, Summit began working with Bank

of America Merrill Lynch ("BAML"), which was already interested in partnering with Gill, as one such potential lender. As of early December 2017, Summit was working towards a deal with BAML and advised Gill that those efforts would likely be successful and that a deal was close. Gill did not raise any objection to BAML at that time.

21. But, a few weeks later and despite Summit's view that Summit and Gill could successfully consummate a deal with BAML as a lender, Gill began to push Summit towards partnering with Huntington instead. Gill asked Summit to have a call with Huntington and to provide details on the financing opportunity to Huntington. Gill also told Summit to provide documents to Huntington, including a draft intercreditor agreement and the investment committee memorandum that Summit was using to recruit lenders. Summit agreed to these requests, and by the end of December 2017, Summit had participated in several phone calls with and provided key financing documents to Huntington. Summit put considerable time and effort, including with its transactional legal team, into drafting and revising these documents.

22. Meanwhile, throughout December 2017, Summit worked tirelessly to identify other potential lenders for Gill, thoroughly canvassing the market. Overall, Summit engaged in meetings, calls, and discussions with dozens of lenders during this time, sixteen of which proceeded so far as to execute confidentiality agreements with Summit regarding the transaction. And, after significant follow-up and discussion, Summit identified three likely lenders to partner in the Gill financing.

23. This syndication effort was extremely challenging given the sector and potential uncertainty with respect to, among other things, industry trends and trade policy. Putting together this syndicate required effectively the full-time efforts of a senior official at Summit, at the expense of working on other deal transactions.

**III.   Gill Circumvents Summit, In Breach Of The Term Sheet.**

24.     On January 11, 2018, Gill indicated to Summit that it had decided to move forward with a financing that would include Huntington as a lender, but utilizing a different structure than that contemplated in the Term Sheet, with Huntington providing financing under a different loan in addition to what Summit would provide.  Gill stated that it "categorically believe[d]" this structure was "more than adequate."  In an effort to close the financing deal, Summit agreed to these conditions.

25.     In conjunction with those efforts, on January 12, 2018, Summit contacted Gill and requested a modification of the expiration date of the Alternative Transaction Fee.  Specifically, Summit requested that "[r]eference to '90' days should be increased to '150' days in the 'Alternative Transaction Fee' section."  These were the only words in the contract that were changed; nothing in the language of the exclusivity clause was altered.  On January 17, 2018, Gill agreed to that modification.  Accordingly, at that time, the period during which Gill was subject to paying an Alternative Transaction Fee to Summit was extended at least through February 18, 2018.

26.     Summit spent late January and early February 2018 working with Huntington on due diligence and an intercreditor agreement.  With the February 18, 2018 date in mind, Summit worked diligently to close the deal.  Throughout that period, Summit and its deal counsel turned numerous drafts of the various legal documents necessary for the transaction.

27.     But Huntington soon began making unreasonable demands of Summit.  On a February 9, 2018 conference call, for example, Huntington made demands of Summit for the Gill financing that were highly unusual for a party in Huntington's role to make, such as requesting that Summit, the lead lender, take substantially less security in the borrower than is typical in this

market. Huntington also insisted on inserting covenant language in Huntington's credit agreement that was extremely rare and contrary to industry practice, such as insisting on inconsistent form covenants for Gill—potentially subjecting Gill to inconsistent obligations to its lenders for no purpose. Summit attempted to contact Huntington to resolve these unusual demands, including with emails on February 13 and February 14, but Huntington did not respond to Summit's emails.

28. This non-responsiveness continued for several days.

29. On information and belief, given what later transpired between the parties, these actions were taken at Gill's direction to purposefully delay Summit closing the financing transaction on or before February 18, 2018. Indeed, unbeknownst to Summit and in advance of the February 18, 2018 closing, Gill, on information and belief, had begun to negotiate a financing with Huntington without Summit's involvement, communicating with each other directly about a possible primary loan for Gill from Huntington that would cut out Summit. On information and belief, these communications began prior to when Huntington began making unreasonable demands, and could have started at least as early as Gill's initial push for Huntington.

30. Summit was unaware of these extra dealings between Gill and Huntington and at no time before February 18, 2018 was it ever expressed to Summit that the deal would not be going forward. To the contrary, Summit continued to work towards a deal with the goal of closing on or before February 18, 2018 and believed based on its correspondence with Gill that, even if the closing slipped past the February 18 date, the parties would close the deal as soon as possible afterwards.

31.     Due to Huntington's lack of responsiveness over these several days, including its failure to respond to Summit's correspondence on February 13 and February 14, the deal did not close on or before February 18, 2018.  Summit continued to work on and review the relevant document drafts and continued to try and contact Huntington on these matters.  Summit even attempted to enlist Gill's assistance in getting Huntington to engage, writing to Gill on February 22, 2018, "I am not sure what else I can do here to get some interaction with [Huntington]. . . . We have been and remain eager to get to closing."

32.     Finally, on February 23, 2018, Summit and Huntington had a call regarding the transaction.  Huntington continued to provide unreasonable challenges to the deal structure and terms.  Immediately after the midday call with Huntington, Summit attempted to contact Gill and requested an update call to share the news of Huntington's continued unreasonable requests and delays.  Typically, Gill would have replied promptly, but for reasons now made evident, Gill ignored Summit's request for a call.

33.     The very next morning, on February 24, 2018, Summit again emailed Gill to reiterate that Summit was fully committed to closing the deal, but would require Gill's help in getting Huntington to act in a commercially reasonable manner.  It was only at that point that Gill agreed to speak with Summit, which occurred later that day.  Gill informed Summit on a phone call that it was moving forward with the financing transaction with Huntington alone— Gill was cutting Summit out of the deal completely.  Considering the extensive diligence and work that was required to put together a transaction with Gill in the first instance, it is implausible to think that this Huntington deal had not been in process prior to February 18, 2018.

34.     The news from Gill was shocking to Summit.  After months of work, the parties had been on the doorstep of closing.  The primary documents between Summit and Gill were in

final or near-final form. There was nothing substantive left preventing Summit and Gill from closing their particular transaction, regardless of the position of Huntington. To the extent any substantive documents remained outstanding, they were either between Huntington and Gill or Huntington and Summit. At no time prior to this call had Summit received any indication that the deal was in jeopardy.

35. Throughout the next several days and weeks, Summit reiterated its commitment to a transaction. Summit continued to communicate with Gill's leadership and advisors. Similarly, Gill's President and advisors continued to engage with Summit. In early March 2018, a senior member of the Summit team even flew to Detroit to speak with Gill's President over dinner about closing the deal with Summit, and Summit made absolutely clear that a deal could still move forward. And yet, notwithstanding those efforts, on March 8, 2018, Gill reiterated that it intended to pursue the financing agreement that it had reached with Huntington, despite the exclusivity obligation in the Term Sheet, and reaffirmed that it would not be closing any deal with Summit. Since then, on information and belief, Huntington has begun contacting the other lenders with whom Summit works to participate in its financing arrangement with Gill, including the very lenders that Summit previously worked to recruit for the Gill financing.

36. In total, counting prior diligence efforts and the costs of its legal transactional counsel, Summit has expended in excess of $600,000 and hundreds of man-hours in pursuit of this transaction over the course of several months. The negotiation process involved multiple trips to Michigan for the Summit team, extensive drafting of reports and memoranda concerning Gill's operations, and significant negotiating and redrafting of a variety of legal documents. Equally important, in order to devote time and energy to the Gill deal, Summit had forgone other potential transactions to its now significant detriment, all while Gill continued to represent and

act consistent with the deal moving forward. In fact, Summit did not pursue other potential deals in the automotive sector, because the transaction with Gill would have filled up most of Summit's allocation to that sector.

## FIRST COUNTERCLAIM
### (Breach of Contract)

37. Counterclaim-Plaintiff alleges and incorporates by reference the allegations of Paragraphs 1-36 of these counterclaims as though fully set forth herein.

38. Summit and Gill entered into a Term Sheet on September 21, 2017. The Term Sheet obligated Gill to work "exclusively with Summit for purposes of providing financing" for some of Gill's debt. The Term Sheet also separately obligated Gill to pay Summit an Alternative Transaction Fee if Gill entered into a financing with a party other than Summit within the designated period.

39. Summit performed under this contract by, among other things, working towards closing the financing transaction contemplated by the Term Sheet.

40. Gill breached its contractual exclusivity obligations under the Term Sheet in a number of ways, including:

    a. On information and belief, Gill worked with Huntington in pursuit of a financing transaction that excluded Summit prior to February 18, 2018, the date to which Gill and Summit agreed to extend the Alternative Transaction Fee;

    b. Gill continued to work with Huntington in pursuit of a financing transaction that excluded Summit after February 18, 2018, despite the fact that, by its plain terms, the exclusivity clause did not expire on that date; and

    c. The parties' continued efforts to close a transaction, and Gill's deliberate efforts to stall the transaction, extended the February 18, 2018 expiration of the

Alternative Transaction Fee, and any other rights thereunder—thus entitling Summit to that entire amount.

41.     As a direct and proximate result of Gill's breach of the Term Sheet, Summit has suffered and continues to suffer damage and harm.

42.     Pursuant to the Term Sheet, Summit is also entitled to "all Expenses incurred" by Summit in the pursuit of the financing transaction, including its attorneys' fees in this lawsuit.

43.     Summit is entitled to recover damages in an amount to be determined at trial, but at least equal in amount to the Alternative Transaction Fee plus its Expenses.

### SECOND COUNTERCLAIM
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

44.     Counterclaim-Plaintiff alleges and incorporates by reference the allegations of Paragraphs 1-43 of these counterclaims as though fully set forth herein.

45.     Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

46.     Gill breached this implied covenant of good faith and fair dealing by, among other things and on information and belief, recruiting Huntington for the purpose of breaching its promise of exclusivity to Summit, working with Huntington on a transaction that did not include Summit, and delaying the transaction beyond February 18, 2018 in an attempt to circumvent the Alternative Transaction Fee, all in bad faith leading Summit to believe that a transaction was in process when Gill had no intention of consummating that transaction.

47.     By then consummating a side-deal with Huntington—and using valuable information from Summit in doing so—Gill deprived Summit of its right to receive the benefits of the Term Sheet.

48.     Summit is entitled to recover damages in an amount to be determined at trial, but at least equal in amount to the Alternative Transaction Fee plus its Expenses.

### THIRD COUNTERCLAIM
#### (Promissory Estoppel)

49.     Counterclaim-Plaintiff alleges and incorporates by reference the allegations of Paragraphs 1-48 of these counterclaims as though fully set forth herein.

50.     By entering into the Term Sheet with Summit, Gill promised to pay Summit an Alternative Transaction Fee if it obtained financing through a different party.  Gill continually renewed this promise by continuing to work with Summit towards a deal and by concealing its intent to close a transaction with Huntington instead.

51.     In so doing, Gill should reasonably have expected to induce Summit to take substantial actions and effort towards the goal of arranging such a refinancing.  Indeed, following the execution of the Term Sheet and the parties' subsequent behavior, Summit relied on Gill's promise and spent significant time and resources in an effort to secure a financing for Gill.

52.     Summit's reliance on Gill's promise to close the transaction or otherwise pay the Alternative Transaction Fee was reasonable.  In order to avoid injustice, Gill's promise must be enforced.

53.     Summit is entitled to recover damages in an amount to be determined at trial, but at least equal in amount to the Alternative Transaction Fee plus its Expenses.

### FOURTH COUNTERCLAIM
#### (Quantum Meruit)

54.     Counterclaim-Plaintiff alleges and incorporates by reference the allegations of Paragraphs 1-36 of these counterclaims as though fully set forth herein.

55. Following execution of the Term Sheet, Summit spent significant time and effort to attract lenders for Gill, conducted extensive due diligence, and drafted and revised numerous legal documents. Through those efforts, Summit successfully recruited several lenders by February 2018 and was in a position to close the transaction. At that time, Summit conveyed the identities of these tentative lenders to Gill and also conveyed substantial documentary drafts and memoranda it had developed in negotiating the contemplated transaction.

56. These efforts, documents, and information were valuable consideration which Summit would not have undertaken, developed, or conveyed to Gill but for the contemplation of a transaction, from which Gill now receives benefit.

57. Given the time and resources that Summit spent in recruiting lenders for Gill, and in negotiating the terms of the proposed transaction and conducting due diligence, an inequitable result would follow if Gill is able to retain those benefits of Summit's work.

58. Summit is entitled to recover the full value of those information, documents, and services in an amount to be determined at trial, but at least equal in amount to the Alternative Transaction Fee plus its Expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiff respectfully requests that the Court:

A. Enter judgment in favor of Counterclaim-Plaintiff on the counterclaims;

B. Award Counterclaim-Plaintiff damages in an amount to be proven at trial, plus interest as allowed by all applicable law;

C. Award Counterclaim-Plaintiff all costs and reasonable attorneys' fees as allowed under the Term Sheet and by all applicable law; and

D.    Grant Counterclaim-Plaintiff such other and further relief as the Court deems just

and proper.

Dated: April 3, 2018                          Respectfully submitted,

                                              SUMMIT PARTNERS CREDIT
                                              ADVISORS, L.P.,

                                              By its attorneys,

                                              */s/ KevinJ. O' Dowd*
                                              Kevin J. O'Dowd (P39383)
                                              Thomas J. Vitale (P74083)
                                              Kotz Sangster Wysocki, PC
                                              40 Pearl Street NW, Suite 400
                                              Grand Rapids, MI 49503
                                              (616) 552-6400
                                              kodowd@kotzsangster.com
                                              tvitale@kotzsangster.com


                                              Carl E. Metzger (BBO # 559329)
                                              Joseph P. Rockers (BBO # 625020)
                                              Tucker DeVoe (BBO # 693426)
                                              Goodwin Procter LLP
                                              100 Northern Avenue
                                              Boston, MA 02210
                                              Tel.: (617) 570-1000
                                              Fax.: (617) 523-1231
                                              cmetzger@goodwinlaw.com
                                              jrockers@goodwinlaw.com
8451.101 / 2177514                            tdevoe@goodwinlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this **3**<sup>rd</sup> day of **April, 2018**, I filed the foregoing **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF DEFEDANT SUMMIT PARTNERS CREDIT ADVISORS, L.P.,** through the CM/ECF system, which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Veronica L. Kuhl*
Veronica L. Kuhl